### UNITED STATES of America, Appellee,

v.

### Anthony GRIFFITH and Christopher Griffith, Defendants–Appellants.

### Docket Nos. 00–1651, 00–1654.

United States Court of Appeals, Second Circuit.

Argued: Nov. 6, 2001.

Decided: March 21, 2002.

---

Ronnie Abrams, Assistant United States Attorney, New York, NY (Mary Jo White, United States Attorney for the Southern District of New York, Celeste L. Koeleveld, Assistant United States Attorney, of counsel), for Appellee.

Sam Braverman, Law Office of Sam Braverman, Bronx, NY, for Defendant–Appellant Anthony Griffith.

Barry M. Fallick, Rochman Platzer Fallick & Sternheim, LLP, New York, NY, for Defendant–Appellant Christopher Griffith.

Before: KEARSE, MINER, and F.I. PARKER, Circuit Judges.

MINER, Circuit Judge.

Defendants-appellants Anthony Griffith and Christopher Griffith, who are brothers, appeal from a judgment of conviction entered in the United States District Court for the Southern District of New York (Baer, *J.*), following a jury trial, convicting each of them of transporting an individual in interstate commerce with the intent that she engage in prostitution in violation of 18 U.S.C. §§ 2422 and 2423, of using a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct in violation of 18 U.S.C. § 2251(a), and of conspiracy to violate each of the aforementioned laws. The district court sentenced Anthony Griffith to 126 months' imprisonment and Christopher Griffith to 120 months' imprisonment. The court also sentenced each of the Griffiths to supervised release periods of three years and imposed special assessments of $400.

For the reasons that follow, we affirm.

## BACKGROUND

From at least April 1999 until their arrests on May 8, 1999, Anthony Griffith and his brother Christopher Griffith recruited into prostitution minors and young women in Bronx County and other locations in New York. On the afternoon of April 28, 1999, fifteen-year-old Ebony,[1] eighteen-year-old Larae Davis, and another girl were standing outside their high school in the Bronx. Ebony was talking with some other friends in a car when the Griffiths pulled up in their car. Davis went to speak with Christopher Griffith, the driver of the car. While they were speaking, Anthony Griffith, who was sitting in the passenger seat, called Ebony over. Anthony asked Ebony her age; instead of telling him that her real age was fifteen, Ebony told him that she was seventeen. The Griffiths asked Ebony and Davis if they wanted to go for a ride. Both girls got into the back seat of the car and the four drove off. After driving for a time, they stopped in a parking lot where Anthony and Davis switched places, leaving Christopher and Davis in the front seat, and Anthony and Ebony in the back seat.

During their drive, Christopher informed Davis that she could "make $500 to $600 a day" prostituting herself and told her that this would involve her "hav[ing] to have sex with white men, oral sex and stuff like that." In addition, he told her that if he wanted to, he would force her, against her will, to perform oral sex on him at that moment. Christopher then received a call on his cellular telephone, which he told Davis was from a girl who "need[ed] more condoms." They then drove to a street corner where they picked up the caller, and all five drove to a McDonald's parking lot. Once there, Anthony asked Ebony to go for a walk. During their walk, Anthony "talk[ed] about making fast money like 400, 500 a day." While Anthony and Ebony were away from the car, Davis told Christopher that she was not interested in prostituting herself, and he drove her to a subway station, where she got on a train and went home.

When Ebony and Anthony returned, only Christopher and the girl Christopher had received the telephone call from were at the car. When Ebony inquired about Davis's absence, she was told not to worry about Davis, and the four of them drove to a parking lot in the Bronx. Anthony then instructed Ebony to perform oral sex on him while Christopher videotaped them.

---

**1.** In order to comply with 18 U.S.C. § 3509, witnesses under the age of eighteen are referred to by only their first names.

Then Christopher told Ebony to perform oral sex on him and gave the video camera to the other girl to videotape them. After videotaping Ebony performing sex acts on them, she was videotaped stating a false birth date Anthony had instructed her to recite "[b]ecause they wanted [her] to be 18."

Later that same day, Ebony began prostituting herself. Anthony gave her condoms, quarters, a phone number to call when she made a certain amount of money, and told her what to charge for different sex acts. The Griffiths also gave her tequila to "help calm [her] down." Until the time of the Griffiths' May 8 arrest, ten days after they first picked up Ebony, she remained with them and prostituted herself, giving all of the money she made to Anthony. In addition to Ebony, the Griffiths also had a number of other girls working for them as prostitutes. On two occasions during the ten-day period that Ebony was with the Griffiths, they drove her to their mother's house in New Jersey to "get cleaned up" and then brought her back to New York to continue prostituting herself.

On May 3, 1999, Ebony's father called the Federal Bureau of Investigation ("FBI") and reported that Ebony had been abducted. The FBI worked with detectives of the New York City Police Department ("NYPD") pursuing leads to try to locate the Griffiths. On May 8, 1999, Christopher Griffith was pulled over in the Bronx and placed under arrest. After he arrived at the precinct, Christopher called Anthony and told him to come there. Christopher was then given Miranda warnings, and in response waived his constitutional rights in writing and agreed to speak with NYPD Detective Victor Harris and FBI Special Agent Michael McAndrew, who specializes in crimes against children, including sexual exploitation of children. Agent McAndrew testified at trial that during the interview, Christopher stated that he had girls working for him who "used their bodies to make money," and "that on several occasions he took girls to ... Teaneck, New Jersey to his mom's house." McAndrew further testified that Christopher explained that "when they went to the house in Teaneck, New Jersey, they just washed up, and he took [the girls] back to New York and they went back to work, using their bodies to make money."

McAndrew also testified that early in the interview Christopher "made a comment about their [sic] being a tape that would prove that he didn't do anything wrong," but that when Detective Harris later asked Christopher about the tape, he responded that there was no tape. Following a break in the interview, McAndrew and Harris again asked Christopher about the tape, and he told them that the "tape was a personal matter and he did not want to discuss it" with them.

In response to Christopher's telephone call, Anthony came to the same precinct and was also placed under arrest. At the outset of an interview with NYPD Detective John Wynne, Anthony also waived his constitutional rights and made oral, written, and videotaped statements regarding the events at issue. At trial, Wynne testified to the oral statements, read the written statement into the record, and the twenty-five-minute videotape was played before the jury. In these statements, Anthony admitted to enticing Ebony to prostitute herself and to be portrayed in a videotape engaging in sex acts. Anthony also spoke with Detective Harris, and Harris testified at trial that Anthony told him that this videotape was in Anthony's Nissan Pathfinder. Harris also testified that Anthony told him where the vehicle was parked and where the tape was located in

the vehicle, and that Anthony gave him the keys to the Pathfinder and consented in writing to a search of the vehicle.

Subsequent to his interview with Wynne, Anthony was interviewed by Agent McAndrew. McAndrew testified at trial that Anthony told him "that on two separate occasions he took Ebony to the house in Teaneck, New Jersey so she could wash up, and after she washed up at the house in Teaneck, he brought her back to New York, and he put her out on the street on Fordham Road to work, and that Ebony worked as a prostitute for him."

Following the interview of Anthony, Harris went to the Nissan Pathfinder with a patrol officer and Agent McAndrew. Harris found the videotape and later made an inventory of all the items retrieved from the vehicle. The videotape, which is one hour and fifteen minutes long, was shown to the jury in its raw, uncut form. The tape depicts Ebony performing oral sex on, and engaging in other types of sexual activity with, the Griffiths and various girls. It also contains scenes from the Griffiths' mother's house in Teaneck, New Jersey, a fact stipulated to at trial by the Griffiths. On the same videotape, the Griffiths describe their prostitution business in great detail. A video camera and other items were seized from Christopher's car earlier that same day. The Griffiths also stipulated at trial that the video camera and blank tape had been shipped in interstate commerce.

On August 10, 1999, the Griffiths were charged in an eight-count indictment. Count One charged the Griffiths with conspiracy to commit the substantive offenses described below. Count Two charged the Griffiths with transporting Ebony in interstate commerce with the intent that she engage in prostitution, and attempting to do so, in violation of 18 U.S.C. §§ 2421 and 2. Count Three charged the Griffiths with

persuading, inducing, enticing, and coercing Ebony to travel in interstate commerce to engage in prostitution, and attempting to do so, in violation of 18 U.S.C. §§ 2422(a) and 2. Count Four charged the Griffiths with transporting a minor, Ebony, in interstate commerce with the intent that she engage in prostitution, and attempting to do so, in violation of 18 U.S.C. §§ 2423(a) and 2.

Counts Five, Six, and Seven charged the Griffiths with committing the same offenses as those alleged in Counts Two, Three, and Four, respectively, with regard to an individual named Jody Ann, who was also a minor. Count Eight charged use of a minor, Ebony, to engage in sexually explicit conduct for the purpose of producing a visual depiction of that conduct in violation of 18 U.S.C. §§ 2251(a) and 2.

The trial began in the district court on March 27, 2000. The witnesses consisted of Ebony, Larae Davis, Jody Ann, Detective Harris, Detective Wynne, Special Agent McAndrew, Suehaye, a minor who testified that the Griffiths attempted to recruit her to work as their prostitute, Stephanie Heather Smith, a friend of the Griffiths, and Ebony's father. On April 4, 2000, the jury returned guilty verdicts against both Griffiths on all counts.

Following trial, the Griffiths moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) or, in the alternative, a new trial pursuant to Federal Rule of Criminal Procedure 33. In a memorandum and order filed September 5, 2000, the district court ruled on the Griffiths' post-trial motions. *United States v. Griffith*, No. 99CR786, 2000 WL 1253265 (S.D.N.Y. Sept.5, 2000). The government consented to the dismissal of Counts Two and Five, on the ground that they were multiplicitous with Counts Four and Seven, respectively. *Id.* at *2. The district court also granted the Griffiths' motion for

acquittal on Counts Six and Seven, the counts relating to Jody Ann, on the ground that the evidence was insufficient to establish that they had taken a substantial step toward transporting her in interstate commerce. *Id.* at *6. Thus, all the counts involving Jody Ann were removed from the case. The court otherwise denied the post-trial motions.

On September 15, 2000, the district court sentenced Anthony Griffith to 126 months' imprisonment, Christopher Griffith to 120 months' imprisonment, each of them to supervised released periods of three years and imposed special assessments of $400.

This appeal followed.

## DISCUSSION

The Griffiths advance four arguments on appeal: (1) that 18 U.S.C. § 2251(a) as applied to their conduct was an unconstitutional exercise of Congress' Commerce Clause power and that in any event there was insufficient evidence to support the interstate commerce elements required for conviction under that statute; (2) that the district court erred in instructing the jury that 18 U.S.C. §§ 2251(a) and 2423 do not require the government to prove the Griffiths knew that Ebony was a minor; (3) that the district court's erroneous instructions regarding scienter as to Ebony's minor status and the district court's dismissal, following trial, of the two counts charging violations of §§ 2422(a) and 2423(a) in relation to Jody Ann were prejudicial to them; and (4) that the district court so restricted cross-examination of witnesses as to deny the Griffiths a fair trial under the Sixth and Fourteenth Amendments.

## I. *The Constitutionality of § 2251(a) as Applied to the Griffiths' Conduct*

The Griffiths first argue that § 2251(a) was unconstitutionally applied in this case

and that the evidence at trial did not establish a sufficient interstate nexus to support their convictions. We review challenges to the constitutionality of federal statutes *de novo. United States v. Bianco,* 998 F.2d 1112, 1120 (2d Cir.1993).

Section 2251(a) provides, in pertinent part:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, ... with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct shall be punished as provided under subsection (d), if [1] such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, [2] if that visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or [3] if such visual depiction has actually been transported in interstate or foreign commerce or mailed.

18 U.S.C. § 2251(a).

Relying primarily on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), the Griffiths first argue that § 2251(a) as applied to their conduct represented an unconstitutional exercise of Congress' legislative authority under the Commerce Clause.

In *Lopez,* the Supreme Court struck down the Gun–Free School Zones Act of 1990 ("GFSZA"), 18 U.S.C. § 922(q), which made it a federal offense for any individual to knowingly possess a firearm within a school zone, holding that GFSZA exceeded Congress' powers under the Commerce

Clause. In doing so, the Court found permissible Congress' regulation of three categories of activities under the Commerce Clause:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. [Third,] Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

*Id.* at 558–59, 115 S.Ct. 1624 (citations omitted).

The *Lopez* Court determined that GFSZA could only plausibly be sustained under the third category. The Court then set forth the following four factors as pertinent in analyzing constitutional challenges to statutes falling within that category: (1) whether the statute relates to an activity that has something to do with " 'commerce' or any sort of economic enterprise"; (2) whether the statute contains a "jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affects interstate commerce"; (3) whether the statute or its legislative history contains congressional findings that the activity sought to be regulated has a substantial effect on interstate commerce; and (4) whether the link between the activity and interstate commerce is not too attenuated. *Id.* at 561–67, 115 S.Ct. 1624. Because the Court found that GFSZA failed to satisfy any of the four factors, it struck down the statute as an unconstitutional exercise of Congress' legislative authority under the Commerce Clause.

In the more recent case of *Morrison,* the Supreme Court analyzed under the same test the constitutionality of the civil remedy provision of the Violence Against Women Act ("VAWA"), 42 U.S.C. § 13981. Despite congressional findings of the impact of gender-motivated violence on interstate commerce, the Court concluded that VAWA was an unconstitutional exercise of congressional law-making authority under the Commerce Clause. The Court determined that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Morrison,* 529 U.S. at 614, 120 S.Ct. 1740. The Court held that none of the other factors favored the government. *Id.* at 613–18, 120 S.Ct. 1740.

As with the statutes in question in both *Lopez* and *Morrison,* the activity sought to be regulated by § 2251(a), the use of a minor to engage in sex acts in order to produce a visual depiction of that conduct, can be sustained only under the third category of activities—those having a substantial relation to interstate commerce—that Congress may constitutionally regulate under the Commerce Clause. The Griffiths challenge the constitutionality of the statute only in regard to the second of the four factors described above, *i.e.,* that the jurisdictional elements of § 2251(a) do not bring the activity regulated within Congress' Commerce Clause power. In both *Lopez* and *Morrison,* the Supreme Court found that the statutes at issue "contain[ed] no jurisdictional element." *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624; *Morrison,* 529 U.S. at 613, 120 S.Ct. 1740. Section 2251(a), in contrast, contains three jurisdictional elements.

As stated above, a defendant who uses a minor to engage in sexually explicit behavior in order to produce a visual depiction of that conduct may be convicted under § 2251(a) if any of the following three

interstate commerce elements is satisfied: (1) the defendant knows or has reason to know that such visual depiction will be transported interstate; (2) the visual depiction was produced using materials that have been mailed, shipped, or transported in interstate commerce; or (3) the visual depiction has actually been transported in interstate commerce. 18 U.S.C. § 2251(a).

The district court instructed the jury that under § 2251(a) the government was required to prove beyond a reasonable doubt at least one of these three jurisdictional elements. The government has conceded that no evidence was produced at trial to satisfy the first interstate nexus and thus that element is not at issue on this appeal.

■ In ruling on the Griffiths' post-trial motions, the district court found both the second and third interstate elements of § 2251(a) sufficient to satisfy constitutional requirements. *Griffith,* 2000 WL 1253265, at *9. The Griffiths challenge as constitutionally insufficient these two jurisdictional elements as applied to their conduct. We need not decide whether the second jurisdictional element, the production of a sexually explicit depiction using materials that have moved in interstate commerce, would alone pass constitutional muster because, as discussed below, we find the third jurisdictional element to be sufficient constitutionally and adequately supported by the evidence presented at trial. Thus, any error in the district court's charge to the jury regarding the second jurisdictional element as an alternative basis for conviction was harmless.

■ Anthony Griffith argues that the "possibl[e]" movement "in a car to New Jersey and back" of the sexually explicit videotape is insufficient to establish the constitutionally required interstate nexus. The Supreme Court has long rejected this line of argument, stating that "where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624 (quoting *Maryland v. Wirtz,* 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)) (internal quotation marks omitted). Thus, the degree to which the Griffiths' individual conduct impacted interstate commerce does not affect the constitutionality of the third jurisdictional element of § 2251(a). *See United States v. Schaffner,* 258 F.3d 675, 683 (7th Cir.2001) (holding that "[t]he actual movement of the [single visual depiction] across state lines directly implicates interstate commerce" and thus meets the constitutional requirement).

■ The Griffiths also argue that the interstate commerce element was not satisfied here because "there was no evidence that the tape was produced to enter the stream of interstate commerce." This argument fails because § 2251(a) does not require that a defendant produce the sexually explicit depiction for commercial gain. We have squarely held that "[i]t is well-established that Congress can regulate activities that involve interstate or international transportation of goods and people, regardless of whether the transportation is motivated by a 'commercial purpose.'" *United States v. Sirois,* 87 F.3d 34, 40 (2d Cir.1996). Thus, whether or not the Griffiths moved the videotape in interstate commerce for commercial reasons does not affect our constitutional analysis of § 2251(a).

Moreover, the Griffiths' reliance on *Lopez* and *Morrison* in challenging the constitutionality of the third jurisdictional element of § 2251(a) is misplaced. Both *Lopez* and *Morrison* examined Congress' authority to regulate under the Com-

merce Clause purely *intrastate* activity. In contrast, the Griffiths' activity here was *interstate* in nature because the "visual depiction [that the Griffiths produced was] actually . . . transported . . . interstate." 18 U.S.C. § 2251(a).

Because it is beyond question that the third jurisdictional element set forth in the statute, the movement of the visual depiction itself in interstate commerce, represents a constitutional exercise of Congress' authority under the Commerce Clause, we hold that § 2251(a) was not unconstitutionally applied to the facts of this case.

■■■ The Griffiths further argue that there was insufficient evidence to support a finding that the third jurisdictional element was satisfied. We review *de novo* a challenge to the sufficiency of the evidence. *United States v. McCarthy*, 271 F.3d 387, 394 (2d Cir.2001). A defendant who challenges his conviction based upon the sufficiency of the evidence bears a heavy burden. *United States v. Velasquez*, 271 F.3d 364, 370 (2d Cir.2001). We consider all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government. *United States v. Naiman*, 211 F.3d 40, 46 (2d Cir.2000).

■■■ We also "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir.1998). "We will not disturb a conviction on grounds of legal insufficiency of the evidence at trial if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Feliciano*, 223 F.3d 102, 113 (2d Cir.2000). These principles apply to both direct and circumstantial evidence. *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Accordingly, to succeed, the Griffiths must demonstrate that no rational trier of fact could have found beyond a reasonable doubt that the depiction of Ebony engaging in sexually explicit conduct moved in interstate commerce.

■■■ Ebony testified that on the first day she met the Griffiths, April 28, 1999, Christopher Griffith and another individual videotaped her engaging in sex acts in the Bronx with both Anthony and Christopher. Ebony further testified that on two later occasions, the Griffiths transported her to New Jersey and then back to New York, a fact admitted to by both Griffiths during their post-arrest interviews. The videotape found in Anthony's vehicle contains scenes of Ebony engaging in sexually explicit conduct and scenes from the house in New Jersey to which the Griffiths admittedly took Ebony on two occasions. That one hour and fifteen minute videotape was played uncut to the jury. Thus, given these facts, we conclude that a rational jury could have found beyond a reasonable doubt that the videotaped depiction of Ebony engaging in sexually explicit conduct was in the Griffiths' possession when they traveled interstate from New York to New Jersey and back to New York.

We therefore reject the Griffiths' challenge to the sufficiency of the evidence supporting their convictions under the third jurisdictional element of § 2251(a).

II. *Scienter as to the Minority Status of the Victim Under 18 U.S.C. §§ 2423 and 2251(a)*

The Griffiths next argue that the district court erred in instructing the jury that neither § 2251(a) nor § 2423 require the government to prove that the Griffiths

knew that their victims were under the age of eighteen.

A. *18 U.S.C. § 2251(a)*

Section 2251(a) reads, in pertinent part: Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, ... with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct shall be punished as provided under subsection (d).... 18 U.S.C. § 2251(a).

 The question of whether § 2251 contains a scienter requirement was discussed in *United States v. X–Citement Video, Inc.,* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). In that case, the Supreme Court held that 18 U.S.C. § 2252, which prohibits "knowingly" transporting, shipping, receiving, distributing, or reproducing a visual depiction of a minor engaging in sexual explicit conduct, required knowledge of age. *Id.* at 78, 115 S.Ct. 464. In reaching that conclusion, the Court distinguished § 2251, following an analysis of its extensive legislative history, and concluded that § 2251 does not contain a scienter requirement as to the victim's age. *See id.* at 74–79, 115 S.Ct. 464. The Court cited in particular two congressional reports. The first, a Senate Conference Committee Report, explained that the deletion of the word "knowingly" from § 2251 reflected "an intent that it is not a necessary element of a prosecution that the defendant knew the actual age of the child." *Id.* at 76, 115 S.Ct. 464 (quoting S. Conf. Rep. No. 95–601, at 5 (1977)) (internal quotation marks omitted).

The second report, issued by a House Committee, stated that "[t]he government must prove that the defendant knew the character of the visual depictions as depicting a minor engaging in sexually explicit conduct, but need not prove that the defendant actually knew the person depicted was in fact under 18 years of age." *Id.* at 77 n. 6, 115 S.Ct. 464 (quoting H.R.Rep. No. 99–910, p. 6 (1986) U.S.C.C.A.N.1986, pp. 5952, 5956). The Supreme Court thus concluded that § 2251 does not contain a knowledge of age requirement. In addition, the two Courts of Appeals that have been presented with this question have reached the same conclusion. *See United States v. Crow,* 164 F.3d 229, 236 (5th Cir.1999); *United States v. United States District Court for the Central District of California,* 858 F.2d 534, 538 (9th Cir. 1988) ("The defendant's awareness of the subject's minority is not an element of [§ 2251(a)]."). Although the Supreme Court's conclusion regarding § 2251(a) was dicta in *X–Citement Video,* we see no reason to dispute its conclusion, or the holdings of the Fifth and Ninth Circuits. We therefore reject the Griffiths' argument that the district court's charge to the jury omitting scienter of age under § 2251(a) was erroneous.

B. *18 U.S.C. § 2423*

The Griffiths advance the same lack of scienter argument with regard to § 2423(a). That provision provides, in pertinent part:

A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce ... with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense ... under this title....

18 U.S.C. § 2423(a).

Although this Circuit has yet to determine whether § 2423 requires knowledge of the victim's minority status, the three Courts of Appeals to have addressed this

issue have held that it does not. *See United States v. Taylor*, 239 F.3d 994, 997 (9th Cir.2001); *United States v. Scisum*, 32 F.3d 1479, 1485–86 (10th Cir.1994); *United States v. Hamilton*, 456 F.2d 171, 173 (3d Cir.1972).

In support of their argument, the Griffiths cite the district court case of *United States v. Kufrovich*, 997 F.Supp. 246 (D.Conn.1997). In *Kufrovich*, the court held that § 2423(b), which prohibits travel in interstate commerce for the purpose of engaging in any sexual act with a minor, contains a knowledge of age requirement, reasoning that

> [i]f "knowingly" applies only to "traveled"[,] it is a superfluous adjective, since it is difficult to imagine how one could travel in interstate commerce without knowing about it. In order to make sense, "knowingly" must refer to the purpose of the traveler, i.e. to engage in a sexual act with a minor. In order to have the purpose to engage in a sexual act with a minor, a person must know that the object of the plan is indeed a minor. A statute is not to be construed in such a manner as to produce "positively absurd" results.

*Id.* at 256 (citing *X–Citement Video*, 513 U.S. at 69, 115 S.Ct. 464).

In ruling on the Griffiths' post-trial motions, the district court rejected the statutory construction of § 2423 advanced by the court in *Kufrovich*. The district court in our case reasoned instead that

> [i]n addition to "transportation," the word "knowingly" might modify "in interstate commerce," thus eliminating the superfluous problem, i.e., although it may be difficult to travel "unknowingly," one could easily travel knowingly without realizing that the travel was interstate. Whatever it modifies, "knowingly" does not modify the purpose of the traveler. There is a separate mens rea

term modifying "engage in a sexual act," namely "intent," and Congress would not likely use two similar mens rea terms to modify a single clause.

*Griffith*, 2000 WL 1253265, at *16.

In *Taylor*, the Ninth Circuit reached the same conclusion. In that case, as in our case, the defendant was convicted under § 2423(a) for transporting a minor in interstate commerce for the purpose of prostitution. 239 F.3d at 996–97. In rejecting the defendant's argument that the statute required the government to prove the defendant knew the victim was a minor, the court stated that "[a] more natural reading of the statute ... is that the requirement of knowledge applies to the defendant's conduct of transporting the person rather than to the age of the person transported." *Id.* at 997. The court reasoned that because the transportation of *any* individual in interstate commerce for the purpose of prostitution is already unlawful under § 2421, "[u]nder ... § 2423(a), the fact that the individual being transported is a minor creates a more serious crime in order to provide heightened protection against sexual exploitation of minors." *Id.*

It is this distinction between lawful and unlawful conduct that drove the Supreme Court's holding in *X–Citement Video*, 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372, a case also cited by the Griffiths in support of their contention. There the Court held that § 2252, which prohibits knowingly transporting, shipping, receiving, distributing, or reproducing a visual depiction of a minor engaging in sexual explicit conduct, contains a knowledge of age requirement because "the age of the performers is the crucial element separating legal innocence from wrongful conduct." *Id.* at 73, 115 S.Ct. 464.

█ The same cannot be said with regard to the activity prohibited by

§ 2423(a) because, as both the district court here and the Ninth Circuit in *Taylor* observed, a defendant is already on notice that he is committing a crime when he transports an individual of any age in interstate commerce for the purpose of prostitution. *Griffith*, 2000 WL 1253265, at *16; *Taylor*, 239 F.3d at 997. Thus, we reject the court's reasoning in *Kufrovich* that § 2423(a) requires scienter as to age in order to avoid an "absurd" result. We agree instead with the Ninth Circuit that § 2423(a) imposes a tougher penalty on those who transport in interstate commerce for the purpose of prostitution individuals who are under the age of eighteen.

We therefore conclude that the district court did not err in instructing the jury that the government was not required to prove under either § 2251(a) or § 2423(a) that the Griffiths knew that Ebony was a minor.

### III. *Prejudice in Charge and Spillover Prejudice*

The Griffiths next argue that the district court's error in failing to charge the jury that §§ 2251(a) and 2423(a) contain a knowledge of age element constitutes prejudice requiring reversal on the remaining counts. Because we have found the jury instructions proper in this respect, we reject the Griffiths' argument regarding prejudice on this ground.

■■■ Although it is not completely clear from the Griffiths' briefs, it seems that they are also arguing that the evidence supporting the dismissed Jody Ann counts infected the jury's verdict on the remaining counts, thereby resulting in prejudice. We disagree here as well. A defendant bears an extremely heavy burden when claiming prejudicial spillover. *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir.1988) ("The defendant must show that he or she suffered prejudice so substantial as to amount to a miscarriage of justice.") (internal quotation marks omitted).

■■■ We consider three factors in determining whether there is a spillover effect sufficiently prejudicial to call for reversal. *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir.1994). First, we look to whether the evidence that related to the dismissed charges was of a type that would "incite or arouse the jury into convicting the defendant." *Id.* Second, we examine the similarities and differences between the evidence relating to the dismissed charges and the evidence relating to the remaining charges. *See id.* Third, we evaluate "the strength of the government's case" on the remaining counts. *Id.* at 856.

■■■ The Griffiths did not suffer any prejudicial spillover. First, the evidence presented in support of the Jody Ann counts could not have incited the jury to any greater degree than the evidence presented to show the remaining counts regarding Ebony. Second, the Jody Ann counts were supported by evidence, primarily her testimony, that was substantially similar in nature to the evidence presented to support the remaining counts. Third, the government's case with regard to the remaining counts was extremely strong in light of the testimony of Ebony and the corroboration of that testimony through the videotape and the testimony of other witnesses. Moreover, the Griffiths' own incriminating statements were nearly identical to the testimony of the government's witnesses.

Thus, we find the Griffiths suffered no prejudicial spillover warranting reversal of their convictions.

### IV. *Scope of Cross Examination*

Finally, the Griffiths argue that the district court's limitations on cross-examina-

tion of witnesses violated their right to a fair trial under the Sixth and Fourteenth Amendments. Specifically, they contend that they were unconstitutionally prohibited from questioning Ebony regarding her relationships with men in general, her father in particular, her drug use, and her sexual history.

The district court found that any possible responses by Ebony on these subjects would not have been relevant. The Federal Rules of Evidence permit admission of only "relevant evidence," which is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. We agree with the district court that Ebony's testimony on these subjects would not have been relevant because it would not have tended to make more or less probable any fact at issue in the case.

■ In any event, the district court permitted both defense counsel to cross-examine Ebony at length regarding the events at issue and lies she had told family and friends as well as lies she had told to the Griffiths. The jury was presented with more than enough evidence from which it could assess Ebony's credibility.

■ District courts are afforded wide discretion to impose limitations on the cross-examination of witnesses. *See, e.g., Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *United States v. Rahman,* 189 F.3d 88, 132 (2d Cir.1999). Only when this broad discretion is abused will we reverse a trial court's decision to restrict cross-examination. *Id.* We find here no abuse of the district court's broad discretion to limit cross-examination of Ebony regarding her sexual history, drug use, and relationship with her father.

The Griffiths also cryptically allege the same constitutional violation with regard to the cross-examination of three other witnesses, Jody Ann, a police officer, and Ebony's father, although they do not cite any specific examples of the court's restriction of cross-examination of any of these witnesses. Since the Griffiths present no facts to support this bald assertion, we conclude that any limitations the district court may have imposed during cross-examination of those witnesses, like those imposed on cross-examination of Ebony, did not constitute an abuse of its broad discretion.

## CONCLUSION

For the forgoing reasons, the judgment of the district court is affirmed.